**TEEGARDEN, Plaintiff-Appellant, v. FOLEY et, Defendants-Appellees.**

Ohio Appeals, Second District, Franklin County.

No. 5378.   Decided July 27, 1956.

Hamilton & Kramer, Power, Griffith & Jones, John Robert Jones, of Counsel, Columbus, for plaintiff-appellant.

C. William O'Neill, Atty. Genl., Hugh A. Sherer, Chief Counsel, Thomas R. Lloyd, Special Counsel, Columbus, for defendants-appellees.

Howard M. Metzenbaum, K. M. Costello, Cleveland, David Clayman, Shocknessy, Summers & Miss Florence Denton, James M. Hengst, Paul R. Gingher, Columbus, Amici Curiae.

(QUATMAN, PJ, MIDDLETON and YOUNGER, JJ, of the Third District, sitting by designation in the Second District.)

## OPINION

By QUATMAN, PJ.

This matter originated with the filing of a petition in the Common Pleas Court of Franklin County, Ohio, in which a declaratory judgment was sought concerning a certain portion of §1317.08 R. C., formerly §6346-22 GC, and for injunctive relief. The petition names the members of the Motor Vehicle Dealers' and Salesmen's Licensing Board, the Director of the Department of Highways, and the Attorney General, all of Ohio as parties defendant.

This action was commenced at a time when Ohio was still operating under the provisions of the former General Code. There is not here

involved, any controversy by reason of the change of section numbers or substantive matters brought about by adoption of the present Revised Code.

The section in question is contained in **Chapter 1317 R. C.**, entitled, the Retail Installment Act, and sometimes referred to as the "Metzenbaum Act" in honor of its legislative sponsor. More particularly, plaintiff seeks to have declared unconstitutional the third paragraph of §1317.08 R. C., which provides:

"No person shall enter into any agreement with any retail seller regarding the purchase, assignment, or transfer of any retail installment contract whereby the retail seller shall receive or retain, directly or indirectly, any benefit from or part of any amount collected or received, or to be collected or received, from any retail buyer as a finance charge or as the cost of insurance or other benefits to the retail buyer, in excess of two per cent of the principal balance of the retail installment contract. No person shall, directly or indirectly, pay to the retail seller, and no retail seller shall, directly or indirectly, receive or retain any part of the amount collected, or to be collected, as a finance charge or retail buyer's cost of insurance or other benefits on any retail installment contract purchased, assigned, or transferred from him, in excess of two per cent of the principal balance of the retail installment contract, provided this paragraph does not apply in case of a bona fide sale of a retail installment contract, if, as part of the consideration for such sale and purchase, the retail seller agrees to act, and does act. as agent for the purchaser in making collection of all amounts due on and otherwise completely servicing said retail installment contract, including billing, posting, and maintaining complete records applicable thereto."

A demurrer, consisting of four parts, was filed to this petition, setting forth, (1) that the court lacked jurisdiction; (2) that there was a misjoinder of parties defendant; (3) that there was a defect in parties defendant; and, (4) that the petition failed to set forth sufficient facts to constitute a cause of action. The demurrer was overruled, as well as a subsequent motion to reconsider.

The defendants then filed their answer, consisting of two parts. First, they reassert the matters raised by their demurrer, and, secondly, allege certain facts tending to controvert the allegations of plaintiff's petition.

The plaintiff thereupon filed a motion for judgment on the pleadings. The motion was overruled, but the court elected to treat the allegations of defendants' second defense as allegations of fact and, for purposes of ruling on the motion for judgment on the pleadings, treated these facts as being admitted, and found in favor of the defendants.

Thereafter, the plaintiff filed a reply controverting the allegations of the second defense, to which the defendants filed a demurrer. The demurrer having been overruled, the matter came on for hearing and the court, having heard all the evidence and examined the exhibits, rendered judgment in favor of the defendants.

It is from this judgment that appeal is taken to this court, sitting by assignment from the Third District of Ohio, on questions of law and fact.

Having regard first to the question of the jurisdiction of the court to entertain the petition, we quote §2721.03 R. C.:

"Any person interested under a deed, will, written contract, or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise, may have determined any question of construction or validity arising under such instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder."

This section seems sufficiently clear and unambiguous as to define and assure the plaintiff in the instant case of his right to a declaratory judgment under the allegations of the petition.

In **Olds v. Klotz, 131 Oh St 447,** the Supreme Court determined that injunction will lie against the enforcement of an unconstitutional law in order to prevent an irreparable injury to a petitioner's business equity.

Defendants assert that there is a misjoinder and defect in the parties defendant. While there might be considerable question as to the interest of the Director of Highways or the necessity of including the Attorney General as parties defendant, we are of the opinion that their inclusion is not prejudicial. **Sec. 2721.12 R. C.,** specifically provides that in any action for a declaratory judgment in which a statute is alleged to be unconstitutional, the Attorney General shall be served with copies of the pleadings and shall be entitled to be heard. This would appear to at least make him an interested party.

It is further contended that the defendants-appellees as Dealers' and Salesmen's Licensing Board are not proper parties because, one, they have no jurisdiction or control over the enforcement of the statute under consideration; and, secondly, the statute provides its own penalty and therefore the Board would be without authority to further penalize through revocation or suspension of license.

The Dealers' and Salesmen's Licensing Board is granted the following authority under §4517.12 R. C.:

"The board may suspend or revoke any license if the licensee has in any manner violated the rules and regulations issued pursuant to §§4517.01 to 4517.18, inclusive, **R. C.,** or has violated §4501.02 **R. C.,** or has violated any law relating to the selling, taxing, licensing or regulation of sales of motor vehicles."

While **Chapter 1317 R. C. (supra),** nowhere specifically mentions the sale of automobiles, or any other specific chattel, as being intended to be regulated by its provisions, it requires no difficult process of reasoning to conclude that the sale of all goods and chattels sold on an installment plan are governed and in effect regulated by its provisions.

It is well recognized, and the evidence in the instant case substantiates the fact, that the great majority of all automobile retail sales are made on an installment basis. This fact is further emphasized by the frequent reference to installment sales, in **Chapter 4517, R. C.,** supra. The ability of the retail seller of an automobile to successfully dispose of the time payment note he is required to accept is of prime importance to both the seller and the buyer. The balance of the provisions of **Chapter 1317, R. C.,** supra, is also highly regulatory of the retail

seller and substantially affects the retail automobile industry. The writer is therefore of the opinion that the violation of any of the provisions of Chapter 1317 R. C., supra, by a retail automobile dealer might very well subject him to a suspension or revocation of his license by the defendant Board, in addition to the penalties provided in the act. The writer is further not impressed with the argument that the Board would be without jurisdiction to so act for the reason that the statute under consideration carries its own penalty. If we were to carry this line of reasoning to its logical conclusion we would arrive at a point where any professional man or other licensee could violate any penal statute at random without fear of suspension or revocation of his license by a board or court as may be provided in such instances by statute. The fact giving rise to suspension or revocation of a license is invariably based on the violation of some penal statute, ordinance or regulation.

It is the contention of the plaintiff that the statute in question, or at least the third paragraph thereof, is unconstitutional for the reason it purports to restrict the amount that may be paid to the plaintiff, and other reail sellers similarly situated, as consideration for the purchase of retail installment contracts, and to limit the purchase price to the maximum amount therein fixed is unconstitutional and void in that it deprives plaintiff and all others similarly situated, from their freedom to contract, liberty and property without due process of law and that the restriction is wholly unwarranted by any consideration of public health, safety, morals, welfare or any other objective with reference to which the State of Ohio under its police power may properly regulate lawful private business and private property contract rights.

There can be no question but that the retail automobile dealer has a definite property right in the note that he accepts in payment of the auto he sells. He is its sole owner, and at his discretion he may determine to retain it and await its payment in full, or he may contract to sell it to another individual or lending institution.

The evidence discloses that it is the practice of the industry to dispose of the note by assignment to a third party. This practice is most often prompted by the financial inability of the dealer to retain sufficient capital to operate his automobile business and also be in the money-lending business. Early in the practice and at a time when the country was not at its present level of economic prosperity, the dealer, in order to dispose of the note, was compelled to take a marginal loss referred to in finance circles as a "discount." However, with the advent of more prosperous times and attendant increased sales, a very keen competition developed among the lending institutions for the "purchase" rather than the "discount" of installment notes. This development brought with it an added source of income to the dealer in that he could realize an additional profit over and above what profit he may have realized on the sale of the automobile. It also placed him in a position where he could bargain with the multitude of lending institutions competing for an assignment to them in installment notes.

The undisputed evidence further discloses that the automobile dealer in at least seventy-five per cent of all sales made on the install-

ment note plan, does in fact control the financing of the sale. Stated another way, this means that seventy-five per cent of all persons purchasing automobiles on a time payment plan will rely on the automobile dealer to arrange the financing and will make no attempt to "shop" for a possible lower finance rate. Having in mind that the vast majority of those who purchase automobiles do so on a time-payment plan, and further recognizing the tremendous volume of sales daily transacted within the retail auto industry, one can well appreciate the impact this financing has on our economy. Recognizing this market, a number of nationwide financing institutions have been established that restrict their services solely to the purchasing from dealers, of time or installment notes.

The evidence further discloses that such institutions, in order to encourage automobile dealers to deal with them in the assignment of their installment notes, actively solicit such business through the medium of trained agents and the offering of complete financing arrangements to the dealer in both his purchases and sales.

The plaintiff in the instant case testified that he sells forty per cent of his installment notes to such an institution. Such an arrangement offers an economic benefit to the automobile dealer by offering him the services of a specialist in his particular field of finance, devoted solely to the retail automobile trade, and indirectly but most certainly to its economic survival. Such an institution, as supported by the testimony, presents severe competition to other lending institutions offering financing services to the public at large, and could potentially drive many such general institutions out of the automobile finance market. Were this result based on normal competition and predicated upon such factors as efficiency of operation, service rendered, etc., there could be no complaint. However, where it can be determined that the business practices of any particular segment of our economy, while benefiting some, nevertheless has an injurious effect on the common weal, such practice becomes a proper subject for legislative investigation and possible control. 10 O. Jur., 2nd, 469. Constitutional Law, Section 389; 36 American Jurisprudence, 482, Section 5.

The Installment Sales Act, Chapter 1317 R. C., was carefully drafted for the single purpose of protecting the consumer when making time purchases by requiring the retailer to make a complete and full disclosure of the terms of the sale and by fixing maximum rates of interest and service charges. These rates have been determined to be eight per cent maximum per annum on each one hundred dollars of credit extended, plus a maximum of twenty-one dollars service charge in any twelve month period. The Act further protects the consumer where the retailer requires insurance against unlawful rates. The Act does not specify the reason for limiting the dealer to a maximum of two per cent of the principal balance upon sale of the installment note, nor is the legislature called upon or required to explain its reasons in the enactment of laws.

While this court well recognizes the resentment that is frequently expressed by commerce and industry toward what often appears to be governmental interference rather than assistance, we are also aware that

limited amounts of regulation are not only desirable but necessary for the survival of free competition and the protection of consumers. The right of the legislature of this state to fix and regulate rates permitted to be charged in the field of finance has long been established. The Supreme Court of this state, as early as 1882, defined the constitutional power of the legislature to enact laws regulating freedom of contract. We quote the following passages from the case of **Smith v. Parsons, 1 Ohio, 236:**

"Although a state legislature can not pass laws impairing contracts, yet they may regulate them, prescribe their form, their effect, and the mode of their discharge, and every contract is supposed to be made with reference to those laws. * * *"

"It is admitted that the states have not given up the entire power of legislating on the subject of contracts. They may, for instance pass laws preventing usury, and fixing the interest of money. * * * These laws are applied to all subsequent engagements, and fix the rights of the parties at the very instant the contract is closed, so that the contract, in its inception, receives an impress from the law, and the effect of the law being coexistent with the contract, can never be said to alter or impair it."

The growth of our commerce and industry since 1822 has brought with it highly complex problems requiring some measure of control by a centralized agency. The result has been an expansion upon the principles enounced in Smith v. Parsons, supra, rather than their restriction, the most outstanding pronouncement of national interest being that of United States Supreme Court in Nebbia v. New York, 291 U. S., 502. This case establishes the right of a state legislature to regulate a given industry by the fixing of prices where the purpose is to prevent abuses and maladjustments and is done in the public interest.

We have merely to examine the statute books of this state to determine to our satisfaction that the retail automobile industry as well as that of commercial finance are subject to governmental regulation. Recognizing, then, the right of the legislature, under its police powers, to invade the domain of these industries by means of legislative enactments, we have but to determine if the enactment under question is reasonably related to the object sought to be accomplished, and, in addition, has a real or substantial relation to the public health, safety, morals, and to the general welfare.

While, as we have stated, the statute in question does not set forth its purpose in limiting a dealer to a two per cent maximum consideration upon the sale of installment notes taken in trade, the testimony of the many expert witnesses as contained in the record, as well as the exhibits, bears ample proof of this purpose.

This testimony tends to prove that any increase in the amount paid to the dealer by the purchaser of his installment notes will in turn have a bearing on the interest rate which the note itself bears. Any amounts paid by the financial institution to the dealer, in consideration of the assignment of the installment note must be figured into its cost. Since the assignee's profit can come only from the interest figured on the note, all costs must be deducted from this figure in order to determine a profit.

On a twelve-month note if the base rate is six per cent and the financial institution is required to pay to the dealer upon its transfer, an amount equal to two per cent of the principal, the purchaser realizes a gross of but four per cent into which it must figure its costs. This two per cent is eliminated, however, when the financial institution makes a direct loan to the purchaser, the dealer not participating. Consequently, the financial institution in that instance will realize a gross of six per cent as compared to four per cent from a dealer. Aside from such items as increasing the efficiency of its operation, reducing its cost of money, and other internal factors the only way the financial institution can regain its loss as between the figure of six per cent and four per cent is to raise the base financing charge to eight per cent. The legislature within its province and discretion has undoubtedly determined that it is unlikely that on a two per cent participation the base cost will level off at the maximum point, and the evidence in this case indicates that the average transaction now taking place, under the statute does so at less than the eight per cent figure. However, should the two per cent limitation be removed there is a reasonable likelihood that base charges would rise.

This court cannot be concerned with the wisdom of the economic policy as adopted by the legislature and incorporated in this measure. Such matters are beyond the powers of this court to determine from a jurisdictional viewpoint and also one of competency. We need only determine that in its more favorable aspect, the legislation enacted bears some reasonable relation to the object sought to be accomplished. **Blackman v. Board of Liquor Control, 65 Abs 97 (1952)**, appeal dismissed in **158 Oh St 368**, motion to certify overruled.

The matter here under consideration has been the subject of legislation in at least eight other states. The Indiana statute differed in one important respect from the one under consideration in that it granted to a board, discretionary powers to establish maximum rates.

In Department of Financial Institutions v. Holt, 231 Indiana, 292, 108 N. E. (2nd) 629, the Indiana Supreme Court found the provision to be unconstitutional, and for the reasons asserted by the plaintiff herein. The Holt case, supra, can be distinguished first, on the basis that the statute there under consideration did not establish maximums but delegated that authority to a state agency. Secondly, the Indiana Supreme Court expressly refused to follow the trend apparent in the decisions of other courts in regard to price fixing legislation.

"This court has in the past consistently refused to follow the 'pattern' or 'drift' apparent in the decisions of other courts which approve mere legislative price fixing." (Page 635, Holt case, supra.)

This is a direct affront on the decision of the United States Supreme Court in the Nebbia case, supra, which latter decision has been adopted by the Supreme Court of this state.

In **State, ex rel. Allstate Insurance Company v. Bowman, 130 Oh St 347**, Stephenson, J., took the following quote from the Nebbia case, supra, in determining the judgment of the United States Supreme Court regarding the legislative authority of a state to regulate trade and the authority of its courts to interfere:

"So far as the requirement of due process is concerned, and in the absence of other constitutional restrictions, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process satisfied, and judicial determination to that effect renders a court functus officio." (Nebbia v. New York, 291 U. S. 502, supra.)

The restriction on dealer participation was removed by act of the Wisconsin legislature in June of 1953. The supervisor of consumer credit of the Wisconsin State Banking Commission was called as a witness by the defendants and testified that after the removal of dealer participation limitations, the base rate on financing charges generally increased, and that this was particularly true of those finance companies doing a large volume of business.

The argument is advanced that the statute under consideration is arbitrary for the reason that it allows a fixed rate of two per cent only and that this fails to take into consideration that the purchaser of an installment note will realize a greater profit on notes, payments on which extend beyond a twelve-month period, and that it also fails to take into consideration notes that are assigned on a recourse or repurchase basis. It is contended that in those instances the potential profit is greater to the purchaser and so the dealers' participation should also be greater than two per cent. While these arguments appear to contain considerable merit, there are arguments to the contra that the legislature must have considered in determining to make the two per cent inflexible. There is the argument that a financial institution incurs greater risk on longer term loans; that the time expended by the dealer in servicing a 24-month finance plan and then assigning it is no greater than that expended in servicing a 12-month plan. An even stronger argument is to the effect that since the dealer controls the majority of the financing arrangements he would tend to unnecessarily encourage longer term notes if it meant a larger profit to him on its assignment, thus deliberately increasing the finance cost to the consumer.

A stipulation contained in the record states that the statute has no application to situations where finance companies assign installment notes between each other and is therefore discriminatory. It also discloses how certain automobile dealers are able to establish what appear to be "dummy" corporations under the guise of lending institutions who receive assignments on notes from the dealer corporation and then reassign the notes to legitimate financial institutions at a rate higher than the two per cent maximum, and in that manner evade the operation of the statute.

In the first instance there is insufficient evidence contained in the record for the court to determine the extent of rediscounting that occurs or to what extent such rediscounting is done at a rate in excess of two per cent for it to conclude that the statute discriminates. In the second instance, it would appear improper that either the plaintiff or "those

similarly situated" can be heard to complain that they can successfully evade the statute by raising a corporate veil or "dummy" partner. Both of these instances may well be proper fields for legislative investigation and correction. However, we do not feel called upon to make a finding concerning these matters in the case here presented.

Upon the issues joined, and for the reasons herein stated, we find the statute in question to have been validly enacted under the police powers of the legislature of this state and reasonably designed to promote the public health, safety, morals, and welfare, and to accomplish its purpose under the law.

MIDDLETON and YOUNGER, JJ, concur.